AARON M. SCHUE, SBN 338760
aschue@ftc.gov
JORDAN X. NAVARRETTE, SBN 306143
jnavarrette@ftc.gov
MILES D. FREEMAN, SBN 299302
mfreeman@ftc.gov
DAVID L. HANKIN, SBN 319825
dhankin@ftc.gov
BARBARA CHUN, SBN 186907
bchun@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for Plaintiff Federal Trade Commission*

[Additional Attorneys for Plaintiffs Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF ARIZONA; THE PEOPLE OF THE STATE OF CALIFORNIA; ATTORNEY GENERAL OF COLORADO; THE PEOPLE OF THE STATE OF ILLINOIS; THE PEOPLE OF THE STATE OF MICHIGAN; STATE OF NORTH CAROLINA; STATE OF OKLAHOMA; COMMONWEALTH OF PENNSYLVANIA; STATE OF SOUTH CAROLINA; UTAH DIVISION OF CONSUMER PROTECTION; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> WALMART INC., a corporation; <br><br> Defendant. | Case No.  3:26-cv-1655 <br><br> **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

Plaintiffs, the Federal Trade Commission (the "Commission" or "FTC"); the Attorney General of the State of Arizona; the People of the State of California, by and through the District Attorney of Alameda County; Philip J. Weiser, Attorney General of Colorado; the People of the State of Illinois, by Kwame Raoul, Illinois Attorney General; the People of the State of Michigan; the Attorney General of the State of North Carolina; the Attorney General of the State of Oklahoma; the Commonwealth of Pennsylvania, by and through its Attorney General David W. Sunday, Jr.; the State of South Carolina; the Utah Division of Consumer Protection; and the State of Wisconsin (collectively, "Plaintiffs"), for their Complaint, allege:

1. The FTC brings this action for Defendant Walmart Inc.'s violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6801–6809, 6821–6827. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and pursuant to Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a).

2. The State of Arizona *ex rel.* Kris Mayes, the Attorney General of Arizona, as part of the same case or controversy, also brings this action for Defendant's violations of the Arizona Consumer Fraud Act, Arizona Revised Statues ("A.R.S.") §§ 44-1521–1534.

3. The People of the State of California, by and through the District Attorney for Alameda County, as part of the same case or controversy, also brings this action for Defendant's violations of the California Unfair Competition Law ("UCL") (California Business & Professions Code § 17200 *et seq.*) and the California False Advertising Law ("FAL") (California Business & Professions Code § 17500 *et seq.*).

4. Philip J. Weiser, Attorney General of Colorado, as part of the same case or controversy, also brings this action for Defendant's violations of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 *et seq.* For these violations, Philip J. Weiser, Attorney General of Colorado, seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief pursuant to Colo. Rev. Stat. §§ 6-1-110 and 112.

5. The People of the State of Illinois, as part of the same case or controversy, also brings this action for Defendant's violations of the Illinois Consumer Fraud and Deceptive Business

Practices Act, 815 ILCS 505 ("Illinois Consumer Fraud Act"), and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510. The Attorney General of the State of Illinois brings this action under Section 7 of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/7) to obtain a permanent injunction, restitution, and civil penalties against Defendant.

6. The People of the State of Michigan, by and through its Attorney General Dana Nessel, bring this action for violations of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 *et seq*.

7. The State of North Carolina, by and through its Attorney General Jeff Jackson, as part of the same case or controversy, also brings this action pursuant to Chapters 75 and 114 of the North Carolina General Statutes. The State of North Carolina, by and through the Attorney General, is charged with, *inter alia*, enforcing North Carolina's Unfair or Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1 *et seq.,* which is intended to protect members of the public from being harmed by unethical and unscrupulous business practices, including deceptive statements and conduct, carried out in commerce. North Carolina's Unfair or Deceptive Trade Practices Act authorizes the State of North Carolina to seek temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, attorneys' fees, expenses, costs, and other monetary and equitable relief for Defendants' acts or practices in violation of N.C.G.S. § 75-1.1.

8. The State of Oklahoma, by and through its Attorney General Gentner Drummond, as part of the same case or controversy, also brings this action pursuant to 15 O.S. § 756.1 for Defendant's violations of the Oklahoma Consumer Protection Act, 15 O.S. §§ 751-763.

9. The Commonwealth of Pennsylvania, by and through its Attorney General, David W. Sunday, Jr., brings this action pursuant to Section 201-4 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law to restrain, by temporary or permanent injunction, any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by Section 201-2(4)(i) through (xxi) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law and to obtain restitution and other relief, as this Court deems appropriate, pursuant to 73 P.S. § 201-1 *et seq*.

10.     The State of South Carolina, by and through its Attorney General Alan Wilson, brings this action for violations of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-20, 50, and 110.

11.     The Utah Division of Consumer Protection brings this action pursuant to the authority granted by Utah Code §§ 13-2-5(3) and 13-11-17.  The Utah Division of Consumer Protection seeks temporary, preliminary, and permanent injunctive relief, rescission of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, fines, and other equitable relief for Defendants' acts, omissions, or practices that violated the Utah Consumer Sales Practices Act, Utah Code § 13-11-1 *et seq.*

12.     The Wisconsin Attorney General brings this action on behalf of the State of Wisconsin.  The Wisconsin Attorney General is vested with the authority to enforce the Wisconsin Deceptive Trade Practices Act.  Wis. Stat. § 100.18(11)(d).  The Wisconsin Attorney General is permitted to seek permanent injunctive relief and restitution to consumers.  Wis. Stat. § 100.18(11)(d).  Wisconsin law also authorizes the Attorney General to obtain civil forfeitures, consumer protection surcharges, supplemental forfeitures, attorneys' fees, expenses, and costs.  Wis. Stats. §§ 100.26(4), 100.261, 100.263, and 100.264.

## SUMMARY OF THE CASE

13.     Defendant Walmart Inc. ("Walmart") owns and operates a merchandise delivery service called Spark Driver ("Spark").  This "last-mile" delivery service delivers goods from a local store or warehouse directly to the ordering customer's home, typically the same day that the merchandise is ordered.  Through the Spark app, Walmart provides consumers who perform gig-work services for Spark ("Drivers") with offers to deliver goods ("Offers") from stores to consumers who have ordered products for delivery ("Customers").

14.     Since at least 2021, Walmart has made false representations to Drivers about three key areas of Driver earnings: the pre-tips selected by Customers at checkout, base pay, and special "Incentive" earnings opportunities.  In addition, Walmart has made misrepresentations to its Customers about whether their tips will be paid to Drivers.

15.    As to the pre-tips that it promises Drivers, Walmart has made misrepresentations about the amount Drivers can expect to receive in three recurring scenarios, all of which have been known problems within Walmart.  First, when Walmart splits a Customer's order among multiple Drivers (something not told to Drivers and which Drivers cannot ascertain themselves), Walmart frequently tells each Driver that they will receive the Customer's full tip amount.  After the Drivers complete the work, however, Walmart divides the tip among all the delivering Drivers, resulting in Drivers receiving significantly less than the tip amount that Walmart represented.  Second, in instances where Walmart combines multiple orders that Drivers see as a single "batched" Offer, Walmart frequently tells Drivers that they will receive tips that, in fact, they do not receive because Walmart removes orders and associated tips from the accepted Offer, often without notifying the Drivers.  Third, for years, Walmart told Drivers that they would be paid tips that, ultimately, Walmart failed to collect from Customers and did not pay to Drivers; only after the Drivers completed the deliveries did they learn that, in fact, they would receive no tip.  In each of these scenarios, Walmart has represented to Drivers tip amounts that the Drivers never received.

16.    In addition to misrepresenting the tips Drivers will receive, Walmart also misrepresents the base pay that will be provided to Drivers.  For instance, when Walmart modifies or removes a delivery from a "batched" Offer, it modifies not only the tip amounts but also the base pay. However, Walmart either entirely fails to notify Drivers of their reduced base pay or tells Drivers about the reduced earnings only after they have accepted the original Offer.  In either case, Walmart surprises Drivers by unilaterally reducing their base pay from what Walmart promised in its Offers.

17.    Walmart also misrepresents extra earning opportunities that it provides to Drivers called "Incentives."  Incentives allow Drivers to earn additional money by completing certain tasks (e.g., refer a new Driver to Spark to earn an extra $100, or complete ten trips in the next seven days to earn an extra $30).  But Walmart regularly misrepresents the conditions Drivers must satisfy to complete these Incentives and regularly fails to pay Drivers for Incentives they have completed.

18.    Finally, Walmart makes misleading representations to its Customers regarding the tips they choose to leave for Drivers.  Walmart tells its Customers that 100% of the tips will go to Drivers. However, in numerous instances, Walmart charges Customers for tips that Drivers do not receive.

19.     All told, Walmart's practices have caused Drivers to lose millions of dollars that Walmart deceptively misrepresented Drivers would earn.  Walmart's practices have also harmed its Customers by collecting tips that were intended for Drivers but ultimately never paid to them.

20.     Walmart has long been aware of the harms caused by its deceptive practices, which have generated thousands of consumer complaints to Walmart, Spark support contacts, internal Walmart audits, and negative social media posts.  Rather than address these well-known issues, however, Walmart has persisted in these practices and continues to attract and retain Drivers and Customers to Spark with false earning claims and misleading representations.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over the FTC's claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

22.     Defendant has transacted business within the State of California and within the geographical boundaries of this District at all times relevant to this Complaint.  Defendant's Global eCommerce Headquarters is located in San Bruno, California.  Spark is part of Walmart's eCommerce division and numerous employees, including high-ranking directors and executives responsible for the Spark program, work in Walmart's San Bruno facilities.  These employees are responsible for the design, operation, maintenance, and support of Spark, and manage the day-to-day operations of Spark.  Nationwide decisions regarding Spark are made by employees located in this District and the state of California generally.  These decisions include, for example, how Offers are presented to Drivers, how much and when Drivers should be paid for their work, and how to respond to Driver complaints and concerns.  Additionally, Defendant operates over 300 stores within California and utilizes Spark to deliver goods from these stores to Customers throughout California and in this District specifically.  Defendant is thus subject to both general and specific personal jurisdiction within the state of California and this District.

23.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

**DIVISIONAL ASSIGNMENT**

24.     Assignment to the San Francisco or Oakland Division is proper.  This action arises in San Mateo County because a substantial part of the events giving rise to these claims occurred in San Mateo County, where Walmart's Global eCommerce Headquarters is located.

**PLAINTIFFS**

25.     The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces Section 521(a) of the GLB Act, 15 U.S.C. § 6821(a)(2), which prohibits "making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution" "to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution."

26.     The State of Arizona is authorized to bring this action pursuant to the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521–1534, to obtain injunctive relief to permanently enjoin and prevent the unlawful acts and practices alleged in this Complaint, and to obtain other relief, including restitution, disgorgement of profits, gains, gross receipts, or other benefits, civil penalties, and costs and attorneys' fees.

27.     The People of the State of California, by and through the District Attorney of Alameda County, are authorized to enjoin repeated and persistent fraudulent, unlawful, deceptive, and misleading business conduct under the California Unfair Competition Law (California Business & Profession Code § 17200 *et seq.*) and the California False Advertising Law (Business & Professions Code § 17500 *et seq.*) to obtain equitable or other appropriate relief, including restitution, civil penalties, and an injunction as may be appropriate.

28.     Philip J. Weiser, Attorney General of Colorado, brings this action by and through Attorney General Philip J. Weiser pursuant to the CCPA, Colo. Rev. Stat. §§ 6-1-101 *et seq.*, which prohibits unfair and deceptive trade practices in the course of a defendant's business or occupation. The CCPA authorizes the Colorado Attorney General to seek, and the Court to grant, civil penalties,

1   injunctive relief, and such orders as may be necessary to prevent the use or employment of deceptive

2   trade practices, to completely compensate or restore to the original position of any person injured, or

3   to prevent any unjust enrichment.  Colo. Rev. Stat. §§ 6-1-110, 112.

4       29.     The State of Illinois is one of the fifty sovereign states of the United States.  Attorney

5   General Kwame Raoul is the duly elected and qualified Attorney General, acting for the Plaintiff

6   State of Illinois, and brings this action in his official capacity for and on behalf of the People of the

7   State of Illinois, pursuant to the provisions of the Illinois Consumer Fraud and Deceptive Business

8   Practices Act, 815 ILCS 505/7, and his common law authority as Attorney General to represent the

9   People of the State of Illinois.  The Illinois Attorney General believes this action to be in the public

10  interest of the citizens of the State of Illinois and brings this lawsuit pursuant to Section 7(a) of the

11  Consumer Fraud Act, 815 ILCS 505/7(a).

12      30.     The Michigan Attorney General, on behalf of the People of Michigan, is authorized to

13  bring this action under Mich. Comp. Laws § 445.905 and § 445.910, and may obtain injunctive relief,

14  actual damages, and other relief under the Michigan Consumer Protection Act, Mich. Comp. Laws §

15  445.901 *et seq.*

16      31.     The Attorney General of the State of North Carolina has the power and the duty,

17  pursuant to N.C.G.S. § 75-9, to investigate the affairs of all corporations or persons doing business

18  in the State of North Carolina and, pursuant to N.C.G.S. § 75-15, upon his ascertaining that the laws

19  have been violated so as to render a corporation liable to prosecution in a civil action, to prosecute

20  such action in the name of the State, and to prosecute all officers or agents or employees of such

21  corporations, whenever in his opinion the interests of the public require it.

22      32.     The State of Oklahoma is authorized to bring this action pursuant to the Oklahoma

23  Consumer Protection Act, 15 O.S. § 756.1, to obtain injunctive relief to permanently enjoin and

24  prevent the unlawful acts and practices alleged in this Complaint, and to obtain other relief, including

25  actual damages of aggrieved consumers, civil penalties, and reasonable expenses and investigation

26  fees.

27      33.     The Commonwealth of Pennsylvania, through its Attorney General, is authorized to

28  initiate proceedings in the public interest to restrain unfair methods of competition and unfair or

1  deceptive acts or practices in the conduct of any trade or commerce, seek restitution, and obtain any

2  other relief, as this Court deems appropriate.  73 P.S. § 201-1 *et seq.*

3      34.    The State of South Carolina brings this action, by and through its Attorney General,

4  Alan Wilson, in its sovereign capacity in order to protect the interests of the State and its citizens.

5  The Attorney General brings this action pursuant to his *parens patriae*, constitutional, statutory, and

6  common law authority, including the authority granted to him by the South Carolina Unfair Trade

7  Practices Act, S.C. Code Ann. §§ 39-5-20, 50, and 110.

8      35.    The Utah Division of Consumer Protection is an agency of the State of Utah created

9  by statute.  Utah Code § 13- 2-1(1).  The Division administers and enforces the Utah Consumer Sales

10  Practices Act, which prohibits deceptive acts and practices in connection with consumer transactions.

11      36.    The Wisconsin Attorney General is vested with the authority to enforce the Wisconsin

12  Deceptive Trade Practices Act.  Wis. Stat. § 100.18(11)(d).  The Wisconsin Attorney General is

13  permitted to seek permanent injunctive relief and restitution to consumers.  Wis. Stat.

14  § 100.18(11)(d).  Wisconsin law also authorizes the Attorney General to obtain civil forfeitures,

15  consumer protection surcharges, supplemental forfeitures, attorneys' fees, expenses, and costs.  Wis.

16  Stats. §§ 100.26(4), 100.261, 100.263, and 100.264.

17                              **DEFENDANT**

18      37.    Defendant Walmart, Inc. is a Delaware corporation with its principal place of business

19  at 702 S.W. 8th Street, Bentonville, Arkansas 72716.

20      38.    Walmart's Global eCommerce corporate offices, which includes its Walmart.com and

21  Walmart Marketplace platforms as well as Walmart's On Demand Delivery business unit and its last-

22  mile delivery channel, the Spark platform, are located at 850 Cherry Avenue, San Bruno, CA 94066.

23      39.    At all times relevant to this Complaint, Walmart transacts or has transacted business

24  in this District, as well as throughout the United States.

25                              **COMMERCE**

26      40.    At all times relevant to this Complaint, Defendant has maintained a substantial course

27  of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C.

28  § 44.

- 8 -

## DEFENDANT'S BUSINESS ACTIVITIES

I.    <u>The Spark Program and Platform</u>

41.    In 2018, Walmart launched Spark to compete in the booming ecommerce and delivery market.  The Spark program utilizes gig-economy workers as Drivers that fulfill deliveries for Walmart Customers by picking up products from nearby Walmart stores, or other retailers that contract with Walmart, and transporting the goods to the Customers' desired location.  Unlike other gig-economy apps such as DoorDash or Uber Eats, Customers do not order directly through the Spark app; instead, they order items from Walmart.com or other vendors online.  Walmart then creates Offers to deliver those items, and distributes those Offers to Drivers via the Spark app.

42.    Spark has grown exponentially since its inception and is currently one of the largest last-mile merchandise delivery services in the country.  It operates in all fifty states and the District of Columbia, with more than a million unique Drivers having made 355 million deliveries from more than 4,200 Walmart stores across 17,000 unique pickup points.

43.    In order to become a Driver for Spark, interested consumers must enroll on the Spark website.[1]  Prospective Drivers must be at least 18 years of age, authorized to work as an independent contractor, pass a background check, own a compatible mobile device, have a valid driver's license, and have their own automobile with proof of auto insurance coverage.  Walmart then approves or denies the Driver application.  For Drivers to receive their Spark earnings, Walmart requires Drivers to set up a "primary earnings account" by providing Walmart with their financial information—either bank account and routing numbers or digital wallet account information.  Drivers are permitted to perform gig work for other platforms; according to Walmart's studies, most Drivers regularly drive for multiple gig-economy platforms at once.

44.    Spark Drivers can perform a variety of delivery jobs.  The most common job is a "curbside pickup," which requires a Driver to travel to a Walmart store, pick up merchandise collected by a Walmart store associate, and deliver the goods to Customers.  Walmart also offers: "shopping and delivery" jobs, which require Drivers to collect items from Walmart store shelves

---

[1] https://sparkdriverapp.com.  The Spark Website was previously, from at least 2021 to approximately October 2024, located at https://drive4spark.walmart.com.

1  themselves and deliver the merchandise to Customers; "return" jobs, which require Drivers to pick

2  up items from Customers' locations and deliver them back to Walmart retail stores; and "Walmart

3  GoLocal" jobs, which require Drivers to perform delivery tasks for other retailers, such as Home

4  Depot and 1-800-Flowers.

5      45.    Walmart distributes Offers containing these delivery job types to approved Drivers

6  through the app.  To receive Offers, Drivers must open the app, tap the button labeled "Spark Now"

7  that signals the Driver's willingness to receive Offers, and set the time period during which the Driver

8  is available to receive Offers.

9      46.    Walmart presents Offers to Drivers as "Offer Cards," which are comprised of two

10  screens.  For each Offer, Drivers are first shown a screen (the "Initial Offer Card"), as shown in Image

11  1 below, that displays basic information including an estimate of the Driver's total earnings, the

12  number of stops, the estimated distance and time for the job, and the time by which the Driver must

13  arrive at the store.  The Driver can reject or accept the Offer by clicking the prominent corresponding

14  buttons at the bottom of the Initial Offer Card.  If, instead, a Driver clicks the blue arrow below the

15  earnings amount on the Initial Offer Card, the Driver will be shown a second screen with more details

16  (the "Trip Details Card"), as shown in Image 2 below.  The Trip Details Card breaks down the job's

17  estimated earnings total into a promised base pay amount for the delivery and any pre-delivery tip

18  amount selected by the Customer ("pre-tip").  A Driver can accept or reject an Offer from either the

19  Initial Offer Card or the Trip Details Card.  After delivery, Drivers can look back at the completed

20  Offer Card to view their ultimate earnings, including any pre- or post-delivery tip left by a Customer.

21

22

23

24

25

26

27

28

Complaint                                                                    Case No. 3:26-cv-1655



| Image 1: Example Initial Offer Card | Image 2: Example Trip Details Card |

47.     Walmart advertises two distinct types of Offers.  The first is the "Round Robin" Offer, which Walmart offers to only one Driver at a time; the Driver has a limited amount of time to accept, and a timer—normally a minute or two—counts down until the Offer expires.  The second is the "First Come, First Serve" Offer, which Walmart purports to broadcast to all available Drivers in the relevant delivery zone; the job is awarded to the first Driver that accepts the Offer.  In both cases, many Drivers have complained that they feel pressured to accept Offers quickly—because of the

1  timer, or because another Driver may take the Offer first—and thus often accept Offers based on the

2  Initial Offer Card, without viewing the earnings breakdown provided only in the Trip Details Card.

3      48.    The "Estimate" displayed on the Initial Offer Card, as shown in Image 1, is comprised

4  of the base pay (paid by Walmart) and any pre-tip (left by the Customer at checkout), displayed as a

5  single earnings amount.  Those components are broken out on the Trip Details Card, as shown in

6  Image 2; base pay is displayed as a "Delivery" amount and, when warranted, as "Extra Earnings" or

7  "Surge Fee" amounts, while any pre-tip is displayed as a "Tips" amount.  Drivers only see the Trip

8  Details Card, prior to accepting the Offer, if they click the arrow on the Initial Offer Card.

9      49.    Base pay is the amount Walmart will pay a Driver for completing an Offer.  Every

10  Offer includes, as base pay, a "Delivery" payment, which Walmart calculates through an algorithm

11  that incorporates several factors.  Some Offers also include, as base pay, "Extra Earnings" for certain

12  arduous factors—such as heavy items or stairs—which Walmart separately computes and displays.

13  If Drivers do not accept an Offer, Walmart may increase the base pay by adding a "Surge Fee" to

14  increase the likelihood the Offer is accepted.  All components of base pay are promised to the Driver.

15      50.    Tips are payments left by Customers for Drivers.  When placing an order, Customers

16  can leave a pre-tip, which Walmart displays to Drivers on both the Initial Offer Card and the Trip

17  Details Card.  The "Tips" displayed on the Trip Details Card are labeled as "pending" with the note

18  that "Customers may adjust a tip amount up to 24 hours after delivery," implying that the pre-tip will

19  change only if the Customer affirmatively changes it.  Customers do not need to affirmatively confirm

20  the pre-tip following delivery; if they do not change it within 24 hours, Walmart charges the Customer

21  for that amount.  Customers can also choose to leave a tip after delivery.  Through advertisements

22  and representations on the Walmart and Spark websites, and on the app, Walmart consistently has

23  represented to both Drivers and Customers that it will pass on 100% of "customer confirmed tips" to

24  Drivers.

25      51.    Walmart is aware that Drivers view earnings as the primary component of Offers.

26  Walmart's own research shows that earnings—e.g., base pay and tips—are preeminent in Driver's

27  minds when weighing whether to accept an Offer.  In an October 2023 survey of Drivers who had

28  been on the Spark platform for more than a year, Walmart found that the top two reasons Drivers

1    rejected Offers were "low offer base pay" and "low tips."  In a July 2022 internal audit, Walmart

2    noted that "[t]ips are a crucial component to attracting drivers to deliver Walmart orders."  And in an

3    April 2023 study, Walmart concluded that "Drivers heavily rely on tips when making decisions about

4    what offers they accept" because "tips are a significant portion of expected earnings (~15%)."

5        52.    In addition to earning money through tips and base pay, Drivers can also earn money

6    through Spark's extra earning promotions, called "Incentives."  Walmart offers both trip-based

7    Incentives, where Drivers are paid for completing a certain number or type of deliveries, and

8    activation-based Incentives, where Drivers are paid for referring others to drive for Spark.  All

9    Incentives involve a promise by Walmart to pay Drivers extra money in exchange for completing

10   certain conditions, as seen in Image 3.



**Image 3: Example Incentive**

27       53.    Walmart alerts Drivers of available Incentives through app notifications.  Drivers do

28   not have to take any affirmative steps to enroll in an Incentive, nor can they choose which Incentives

Walmart makes available to them.  If a Driver performs the tasks described in an Incentive that applies to their account, they are entitled to receive the payment described in the Incentive without taking any further action.

**II.     Walmart Advertises Pre-Tip Amounts Drivers Do Not Receive**

54.     Walmart promises Drivers specific tip amounts in its Offers.  Yet, in many instances, the earnings amounts Walmart displays are false and misleading.  In at least three recurring scenarios, Walmart has deceived Drivers by displaying pre-tips that Walmart knew or should have known Drivers would not receive.

**A.     Walmart Misrepresents Pre-Tips in Split Orders**

55.     Walmart frequently breaks up a Customer's single order into multiple deliveries to be made by multiple Drivers, otherwise known as a "split order." For these split orders, Walmart advertises pre-tip amounts that Drivers will not receive: if the Customer has left a pre-tip, Walmart displays the full amount of the pre-tip to each Driver on their respective Offer Cards, despite the fact that each Driver will not receive that tip upon completion of that Driver's trip.  After the delivery is complete, Walmart splits the tip amount among those Drivers who delivered a portion of the order.  In some instances, Walmart splits the tip evenly among the Drivers.  In others, Walmart unevenly splits the pre-tip or allocates the entire pre-tip to a single Driver.

56.     Drivers do not know and cannot tell when Walmart will split a pre-tip amount displayed in an Offer Card.  Walmart does not tell Drivers when an Offer includes part of a split order, and there is no way for Drivers to ascertain that fact.   Offer Cards do not advise Drivers that pre-tips may be split among multiple Drivers; they inform Drivers only that pre-tip amounts may be subject to change at the Customer's discretion.  Drivers thus have no way of knowing that the pre-tip amount Walmart states in an Offer is false.  Even after the Driver completes their delivery and receives a smaller pre-tip than offered, Walmart does not inform the Driver that it reduced the pre-tip because the delivery was part of a split order.

57.     Walmart, on the other hand, knows it will split pre-tips when it presents Drivers with Offers to deliver split orders.  Walmart controls when it splits orders and how it presents split orders to Drivers.  Yet, since it began displaying pre-tips in Offer Cards in 2021, Walmart has consistently

1    presented the Customer's entire pre-tip amount to each Driver delivering a split order.  The internal

2    Walmart team workspace—a Wikipedia-like platform maintained and reviewed by Walmart

3    employees and executives—is replete with references to split tips as a Driver earnings issue and a

4    frequent source of Driver complaints.  In December 2022, the workspace page for "T ipping" issues

5    noted that, "[i]n order split cases, drivers are paid only 50% of the tip amount promised in the offer

6    card at assignment" and marked this scenario as a "Problem" that related to "Promise Accuracy."  In

7    January 2024, the workspace page regarding "Payment Processing" issues stated that "the tip is

8    unevenly split when more than 1 driver is added to a trip and the offer card presents inaccurate tip

9    information."  That same page indicated that there were "+2k instances per week of inaccurate tip

10   earnings delivered," reflecting Walmart's matter-of-course splitting of advertised pre-tips, despite

11   presenting the full pre-tip to each Driver.  In October 2021, a Spark support agent summarized

12   Drivers' complaints regarding this issue: "[D]rivers are told they get to keep 100% of their tips and

13   if it's being split then that is no longer the case."

14           58.     Because Walmart knows when an Offer reflects a split order, it could have adjusted

15   the pre-tip it displays to Drivers to accurately reflect that it will split the tip after completion of the

16   delivery.  Instead of doing so, Walmart has displayed higher pre-tips to Drivers in Offer Cards than

17   the Drivers will ultimately receive, which has falsely inflated the displayed earnings and has made

18   the Offer seem more attractive to Drivers than it is.  These misrepresentations were not simply the

19   result of a technological error; as a Manager of Spark's Driver Experience division stated, this system

20   has been "working as designed."

21           **B.     Walmart Misrepresents Pre-Tips in Batched Orders**

22           59.     Since at least 2019, Walmart has used a system referred to internally as "batching."

23   Batching allows Walmart to present Drivers with multiple Customer orders as a single Offer with

24   multiple stops.  Walmart's batching system allows Walmart to modify Offers—including through

25   what Walmart refers to as "unbatching," or removing orders from the batched Offer—before, during,

26   and after they are offered to Drivers.  Walmart thus removes or "unbatches" orders from Offers both

27   pre- and post-Driver acceptance, but before Drivers physically receive the items for delivery.

28

60.    Walmart's batching system affects the tips that Drivers receive. When Walmart provides a "batched" Offer to Drivers, it combines the pre-tips associated with all the batched orders in the Offer into a single pre-tip figure, which Walmart incorporates into the estimated earnings advertised on the Initial Offer Card and displays as a separate line item on the Trip Details Card. Images 1 and 2, *supra*, depict an Initial Offer Card and Trip Details Card for a batched order. Thus, for example, when Walmart batches three orders into a single Offer, the Offer Card reflects a combined tip amount composed of any Customer pre-tips associated with those three orders. When Walmart unbatches an order from an Offer, Walmart also removes any pre-tip associated with that order; thus, if only one of three batched orders had a pre-tip and that order was removed from an Offer, the Driver would not receive any pre-tip after completing the Offer

61.    Walmart's use of batching and unbatching often results in Walmart misrepresenting in its Offers the estimated earnings Drivers will receive. In many instances, Walmart removes an order from a batch *before* offering that batch to a Driver, but fails to update the Initial Offer Card to reflect the reduced earnings estimate; the affected Driver is thus unaware that the Offer reflects a pre-tip that Walmart already removed and which the Driver will not receive. Other times, Walmart unbatches an order from an Offer *after* the Driver has accepted it, but fails to inform the Driver that the unbatched order had a pre-tip associated with it that the Driver will no longer receive; the affected Driver thus completes the remaining deliveries without knowing Walmart has reduced the pre-tip the Driver could receive. In both instances, the Driver undertakes their work—foregoing other gig opportunities, driving to the store, and performing the deliveries that were not unbatched from the Offer—without knowing their potential tips are less than Walmart advertised to them when they accepted the Offer.

62.    When they do discover their pre-tips have been reduced, many Drivers erroneously believe that the Customers—not Walmart—are responsible for the reduction in pre-tips, or that the Drivers suffered from "tip-baiting" (when a Customer leaves a pre-tip amount but reduces it after delivery). A December 2023 Walmart internal investigation concluded that Customer "tip-baiting" occurs in just 0.4–0.9% of orders. However, because Walmart often tells Drivers that the tip amount

"was adjusted to reflect the confirmed customer payment," Drivers blame the Customers for these reduction in their tip amounts.

63.    In November 2022, Walmart documented in detail one example of how flaws in the Spark platform's design led to Walmart making tip misrepresentations in its Offers to Drivers. A Manager of Spark's Driver Experience division asked those employees to explain why the pay for an Offer changed after the deliveries were completed. That Offer reflected a batch of five orders that Walmart advertised as paying $26.06 in pre-tips, which came from two of the five orders. Unbeknownst to the Drivers, between the time that this job was offered to Drivers and the time that a Driver accepted, Walmart unbatched the two orders that contained pre-tips from the Offer. Yet because Walmart's internal systems failed to update the Initial Offer Card shown to Drivers, it still advertised the earnings from the original batched job—including the now-false pre-tip amounts— even though Walmart knew or should have known that the Driver would necessarily not receive those amounts in pre-tips after completing the delivery.

64.    Such system communication issues have frequently caused Walmart to overstate pre-tip amounts on unbatched orders. This has been a known problem within Walmart; in an August 2023 email to the Director of App Stability and Driver Success, a Walmart employee explained that the "tip from the unbatched orders remains in the offer card pricing" because "[o]rder cancellation data is not sent to downstream systems […] this is nothing new. We have bugs on the same since 2022." As a Senior Manager of Spark Operations acknowledged in a March 2023 internal presentation, "App Limitations" and "Backend System Failures" continued to be reasons that "Drivers accept offers with a tip that is greater than what they actually earn after completing a delivery," but Driver ignorance as to those issues led them to blame Customers for the tip reductions (see Image 4, below).





**Image 4: March 2023 Internal Presentation re: Tip Issues**

65. Despite Walmart's awareness of the issue, it has continued to make unbatching-related tip misrepresentations. For example, in August 2023, Walmart employees exchanged emails with the subject, "Unbatched orders are showing wrong tip amount to the drivers," in response to a missing pre-tip of $10.01. One Walmart employee circulated a list of all the trips that had a tip amount associated with them which became unbatched. In response, the Director of Spark's App Stability and Driver Success noted that Walmart had shown false pre-tip amounts to approximately 560 Drivers over just a 48-hour period.

**C.    Walmart Misrepresented Pre-Tips It Could Not Collect**

66. From at least July 2021 to January 2023, Walmart represented pre-tips in Offers to Drivers that it ultimately did not collect from Customers and which Drivers did not receive, despite completing the work. Walmart referred to these misrepresented and lost tips as "failed charges" or "tip failures" ("Tip Failures"). Throughout this period, Walmart was aware that Tip Failures were a widespread issue resulting in significant Driver harm. Walmart employees acknowledged that, "[s]ince the drivers see these tips as part of the offer, they expected these to be received. But these tips failed due to authorization / network errors." Yet Walmart continued to falsely represent to

Drivers that they would receive the stated pre-tip amount unless—and only if—the Customer modified the tip, without mentioning that the stated tip might fail due to payment authorization issues.

67.    Tip Failures occurred because, beginning in July 2021, Walmart chose to advertise pre-tip amounts to Drivers in Offers without taking any action to confirm that it could collect those pre-tips from Customers.  During checkout, Walmart permitted Customers to leave a pre-tip for their Drivers by either selecting a default tip option or entering a custom amount.  When a Customer would submit their delivery order, however, Walmart would "pre-authorize" only the Customer's order amount (to be paid to Walmart), and not the Customer's pre-tip amount (to be paid to Drivers). Preauthorization is the process by which a retailer confirms that a charge on the Customer's provided payment method will be successful by issuing a temporary hold on the account.  By design, Walmart would not process a Customer's delivery order if it could not preauthorize the order amount; Walmart would, however, process the order without ensuring it could collect the pre-tip amount for the Driver.

68.    Nevertheless, Walmart would still display the pre-tips on the Offer Card, as part of the earnings stated on the Initial Offer Card and as a separate line item on the Trip Details Card.  If, following delivery, even if the Customer did not adjust the pre-tip amount within 24 hours after the delivery, Walmart could not successfully collect the pre-tip from the Customer, Walmart would simply not provide the Driver with the tip and a Tip Failure occurred.  Walmart did not notify Drivers that a Tip Failure occurred; rather, as displayed below in Image 5, the Spark app only reflected that the pre-tip amount had been reduced to $0—in exactly the same way that the app reflected Customer changes to pre-tips.

- 19 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14



**Image 5: Sample Trip Earnings Card with Tip Reduced to Zero**

15  69.    Within weeks of enabling pre-tipping, Walmart was aware that thousands of Tip

16  Failures occurred each week, yet it continued to represent millions of dollars in uncollectible tips to

17  Drivers.

18  70.    Walmart designed their system this way because Walmart did not want to "prevent

19  checkout in case customer [sic] has funds for the order but not the tip."  In other words, Walmart did

20  not wish to risk losing a sale if a Customer's payment method could not cover both the order and tip

21  amounts, so it chose to secure its own funds while leaving Drivers to unknowingly bear the risk of

22  Tip Failures.

23  71.    Walmart knew that it was advertising unsubstantiated pre-tips to Drivers' detriment.

24  For example, in an August 2022 email with the subject line "Tipping Trustbuster," a Walmart Spark

25  manager identified an instance in which a Driver had complained about Walmart's failure to pay the

26  Driver a promised $15 pre-tip.  The manager asked his subordinate to investigate why Walmart had

27  not paid the pre-tip to which the subordinate responded that Walmart did not pay the $15 pre-tip

28  because "there was a failure when trying to charge for the tip."  These issues were recurrent:  A July

2022 Walmart internal audit remarked that "[t]ips placed on [Spark orders] are not preauthorized which increases the risk of committed tips not being collected or passed on to driver," and observed that "[t]he lack of pre-authorization for tips can negatively impact the Spark drivers' experience due to not receiving tip payouts as expected."  The audit also noted that, because "Walmart does not pre-authorize pre-tip amounts placed at checkout" and "Walmart only authorizes the final amount committed by customers after the 24-hour pre-tip window," it "increase[d] the risk of declined transactions as many credit card providers flag these small dollar secondary charges as fraudulent and automatically decline them."  It went on to say "[t]his is a known issue that was communicated to audit by [Spark's] leadership during the audit."

72.     Walmart executives knew Drivers were not receiving the tips that Walmart advertised in their Offers, but for years refused to address the issue.  In September 2022, Walmart's Senior Vice President in charge of Spark informed Walmart's CEO that Walmart was misrepresenting the pre-tips in Drivers' Offer Cards by stating them without checking if the Customer could pay them:  "All other platforms charge a pre-auth for the driver tip so that it doesn't fail 24 hours later.  Spark Driver/Walmart is the only one that doesn't have a pre-auth tip for drivers.  This means that due to any issues/technical difficulties if the tip payment doesn't go through, then the driver's tip is taken back."  She also acknowledged that, though Walmart employees were aware of the problem, they had taken no steps to fix it:  "While a top problem for our drivers since the last 2 years, it wasn't prioritized for last 4 quarters due to other priorities[.]"

73.     As that Senior Vice President acknowledged, Tip Failures were a highly salient issue for Drivers.  In January 2022, a Walmart employee proposed that Walmart notify Drivers when Tip Failures occurred: "I believe, it is the Driver's right, to be notified, if Walmart failed to charge the customer; even if it's a 3rd party processor issue."  But the Spark team rejected the idea, expressing concern that Drivers would quit Spark if they knew that Walmart did not substantiate the pre-tips it advertised in its Offers: "I don't think we need to show them failure.  It's going to start a landslide of negative [...] And and [sic] drivers not wanting to accept orders anymore because of it."  That is, as documented in Image 4, Walmart knew that Drivers erroneously blamed Customers for all reductions in tips and chose to benefit from, rather than correct, that misconception.

74.     As Tip Failures mounted, Walmart persisted in representing unsecured pre-tip amounts, resulting in Drivers losing out on millions of dollars.  Internally, Walmart quantified Tip Failures as a multimillion-dollar problem that only grew in impact over time.  In 2021, Walmart employees periodically circulated reports on the problem: by their accounting, one week in October saw around $84,000 in Tip Failures, which grew to a weekly average of around $90,000 in lost tips (from 13,000 Tip Failures) by January 2022.  Those numbers continued to rise throughout 2022:  A single week in February saw over $114,000 in Tip Failures.  In September, Walmart identified that, in the prior fiscal quarter, approximately 750,000 orders experienced a Tip Failure.  Five weeks in September and October then saw a combined $1.2 million in lost tips due to over 179,000 Tip Failures.  The issue was of sufficient concern for Walmart to require employees to circulate a weekly audit of tipping issues; the audit circulated on December 22, 2022, indicated that, over just the prior four weeks, Walmart had misrepresented, and Drivers had lost out on, $1.4 million in tips due to approximately 217,000 Tip Failures.   Looking back at the problem in January 2023, Walmart summarized its scope: "On an average ~220K tips/ month with an average sum of $1.5M/month failed."

75.     In January 2023, Walmart began to substantiate the pre-tips it advertised, and significantly reduced the occurrence of Tip Failures.  It did so by expanding its use of preauthorization to cover pre-tips, and not just Customers' order amounts, such that the risk that Customers' pre-tip charges would fail was no longer being unwittingly borne by Drivers.

76.     In sum, Walmart misrepresented millions of dollars of pre-tips that it did not collect from its Customers and which Drivers ultimately did not receive.  Walmart engaged in this practice willfully and continued this unlawful practice for years despite knowledge of numerous Driver complaints.  Indeed, Drivers continue to complain that they have not received their promised pre-tips as of the filing of this complaint.

**III.     Walmart Misrepresents Base Pay in Offer Cards**

77.     In addition to misrepresenting the tips Drivers will receive, Walmart also regularly misrepresents the base pay that it promises to Drivers.

78. As discussed above, Walmart provides Offers to Drivers through Offer Cards. The Initial Offer Card includes the total estimated earnings the Driver can expect to receive after completing the delivery (see Image 1, *supra*). If a Driver clicks the blue arrow on the Initial Offer Card, they see a Trip Details Card that breaks down the offered earnings into a base pay amount paid by Walmart (see Image 2, *supra*) and any pre-tip that the Customer selected when placing their order.

79. Walmart calculates base payments using a variety of factors, including, for example, the number of orders in the delivery and the distance between the store pick-up location and the Customers' drop-off location(s). All else being equal, an Offer that includes more orders will pay a higher amount of base pay than a similar Offer containing fewer orders.

80. Walmart commits to paying, and Drivers understand that they will receive, at least the base pay amount (or more, if the Driver accrues wait-time fees while waiting for order fulfillment at a Walmart store) unless all orders in the Offer are cancelled (whereupon the Driver is paid a cancellation fee and, if applicable, a wait-time fee). In other words, unless an order is cancelled, the base pay Walmart offers Drivers should only increase, not decrease.

81. As explained above, however, Walmart sometimes consolidates multiple Customer orders into a single Offer through its batching system. Walmart's system of batching and unbatching orders can result in a Driver accepting an Offer with, for example, three Customer orders listed in the Offer Card. But, because Walmart retains the ability to unbatch orders at any time before the Driver picks up the merchandise, that Driver who accepts an Offer with a batch of three orders may ultimately be asked to only deliver two orders. In this scenario, Walmart will reduce the Driver's base pay to reflect that they are only delivering two orders instead of three. This change in the Offer and associated reduction in pay can occur before or after a Driver has accepted the Offer. However, in many of those instances, Walmart fails to update the Offer Card and thus fails to disclose the reduction in base pay—even to Drivers who have begun their work. In those instances, as a consequence of Walmart's misrepresentations, the Driver who accepts that Offer ultimately receives less pay in base pay than Walmart advertised.

82. Walmart's practice of displaying a higher base pay in Offers than what it ultimately pays Drivers has been a pervasive issue since at least 2021. This issue occurs so regularly that

- 23 -

Walmart, when tracking Driver complaints on the topic, has branded it with the broad monikers, "Driver Paid Less Than Accepted" and "Price Variance." By November 2022, a Walmart employee went so far as to email others, including the Director of Driver Success for Spark, to say that Walmart's misrepresentations regarding base pay were a "serious issue/legal risk" that resulted in "drivers [] perceiving that Walmart is paying drivers incorrectly." In December 2022, Walmart's Vice President responsible for Spark emailed other Directors and Senior Directors to ask if Walmart "ha[d] a plan on" how to address Driver complaints that their base pay was being misrepresented.

83.    These issues continued to persist into 2023 and became a source of routine complaints by Drivers to Walmart employees. For example, in January 2023, a Manager of Driver Experience at Spark noted that Walmart was receiving approximately 2,000 Driver complaints every week regarding the reduction of Driver base pay due to unbatched orders, that this issue was creating "distrust," and that "the drivers believe that [Walmart is] stealing money from them."

84.    In January 2023, that same Manager emailed the Director of Driver Success at Spark to propose a solution to the issue. The Manager noted that "Spark drivers are receiving offers where the total estimated price changes after accepting the offer [and] [t]here is not transparency to the drivers about the discrepancy." The Manager recognized that when a Driver is "*paid less than accepted,*" it was a "frustrating experience" for Drivers that could "result in reports to the FTC/other agencies" and proposed that Walmart "pay the driver the initial offer price." Walmart did not implement this proposed solution.

85.    Base pay misrepresentations have become so pervasive that, in February 2023, Walmart employees performed an internal audit to see how frequently Walmart made "Offer Price Changes after [Offer] Acceptance." Based on a partial review of Offers to Drivers using iPhones, they concluded that Walmart was, on average, overstating Driver base pay in over 16,000 accepted Offers daily. The employees noted that this calculation likely underestimated the true scope of harm.

86.    After years of misleading Drivers and causing millions of dollars' worth of injuries, Walmart employees attempted to address one aspect of these undisclosed reductions to base pay through an effort named "Project Blindside." In the internal Walmart team workspace page on

"Earnings Trust Issues," one employee wrote the following "Problem Statement" that Project Blindside was intended to solve:

> Today, after an offer is published or accepted, if there is a change / cancellation in the order either by customer or store associate, we are not informing driver about the changes adequately leading into confusion about their earning changes[.]

As described by Spark's Director of Driver Success, "Project Blindside is a feature enhancement [to Spark] that was meant to address the concern that … there are changes to an order and the [D]river may feel that it's not very clear to them[.]"  In particular, changes to a multi-stop batched order—where "there is an unbatching event, regardless of whether it was done by a [Walmart store associate] or the system unbatched it because of a customer cancellation"—would result in an undisclosed reduction in base pay from what Walmart advertised to Drivers in the Offer.  That reduction would, as the Project's name alluded to, blindside Drivers when they realized they ultimately received less pay than Walmart advertised in the Offer.  Following Project Blindside, Walmart began notifying some Drivers of these reductions in base pay through an in-app pop-up notification

87.    Yet despite Walmart's awareness of this issue, Drivers have continued to complain about reductions in base pay.  In June 2023, after "Project Blindside" was conceived, Walmart estimated that 33,600 Drivers were still actively complaining about deceptive reductions in pay every week.  Even Drivers who did receive pop-up order updates complained that they did not learn about Walmart's modifications to their Offers until after they had accepted Walmart's initial Offer and started driving to the store—or worse, while waiting at the store for Walmart associates to collect the merchandise—and foregone other gig work opportunities in reliance on Walmart's earnings representations.  In February 2024, a Walmart report regarding "Earnings Trust Issues" listed "[a]ccepted price is changing on app (after driver accepts offer)" as an "open issue" that was part of a "backlog" of issues still to be addressed.  Other internal documents from February 2024 indicate that Walmart continues to "vary"—i.e., reduce—the base pay it ultimately pays Drivers from what Walmart stated in their accepted Offers, thus continuing to "blindside" Drivers.

88.    Drivers consider Walmart's representations regarding base pay to be material, and act reasonably in believing Walmart's representations regarding base earnings.  Walmart's own surveys

1   demonstrate the importance to Drivers of receiving accurate information regarding base pay:  As

2   early as September 2021, the head of the Spark program recognized the importance of earnings to

3   Drivers when he advised his colleagues that "[e]arnings is a sensitive matter for drivers" and directed

4   Walmart employees to take steps to "avoid as much as possible putting the blame on Walmart due

5   to" earnings misrepresentations.  In February 2023, Walmart employees conducted a survey of

6   Drivers and asked them to provide feedback on Offer Cards specifically.  In response, Drivers

7   identified "Earnings Do Not Update if One Order (Batch) is Cancelled" and "Actual Earnings Differ

8   from Estimated Earnings" as top concerns regarding the accuracy and reliability of Offer Cards.

9   **IV.    Walmart Misrepresents Incentive Requirements and Fails to Pay Drivers for Completed**

10         **Incentives as Promised**

11         89.    Walmart also misrepresents Incentive opportunities it offers to Drivers in at least two

12   ways.  Incentives are promises by Walmart to provide bonus payments to Drivers who complete

13   certain tasks within a specified period of time (e.g., referring a new driver to the platform, completing

14   a certain number of deliveries, or completing deliveries during a particular time period or in a

15   particular area).  Walmart uses Incentives as a way to increase active Driver supply to meet Spark's

16   delivery needs.

17         **A.    Walmart Regularly Fails to Disclose the Conditions a Driver Needs to Meet in**

18               **Order to be Paid for an Incentive**

19         90.    First, in numerous instances, Walmart deceptively fails to disclose to Drivers all of the

20   conditions necessary to complete an Incentive.  Walmart then refuses to pay Drivers who complete

21   the stated Incentive requirements but fail to satisfy Walmart's undisclosed conditions.

22         91.    As an example of this practice, Walmart has regularly advertised a "Referral

23   Incentive" where Walmart promises to pay Drivers if they refer new Drivers to Spark.  An example

24   of such a Referral Incentive is shown below in Image 6.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



**Image 6: Example Referral Incentive**

18      92.      But in numerous instances where Walmart has offered a Referral Incentive, it has not

19 adequately disclosed that, in fact, Walmart would only pay the Referral Incentive if the newly

20 recruited Driver performed deliveries in a particular zone or for a particular store.

21      93.      Nor is Walmart's failure to disclose all Incentive conditions limited to Referral

22 Incentives.  For example, on September 21, 2022, Walmart sent an Incentive to Drivers in the Salem,

23 Oregon delivery zone promising to pay Drivers an extra $5 for each trip they completed that day.  But

24 Walmart failed to disclose that, it would actually only pay the Incentive for deliveries performed from

25 *one* of the Walmart stores located within the zone.  Thus, Walmart did not pay Drivers who performed

26 deliveries from other Walmart stores within the Salem, Oregon zone, despite the plain text of the

27 Incentive.  Following Driver complaints, Walmart added this Incentive to a list of dozens of other

28

1  Incentives that had similarly failed to disclose all conditions necessary for payment and had thereafter

2  generated Driver complaints that they were deceived by the offered Incentives.

3       94.     Another example of Walmart deceiving Drivers by failing to disclose all Incentive

4  conditions is shown below in Image 7, which depicts a Driver complaint posted on Facebook that

5  Walmart employees discussed internally.  Here, Walmart promised that it would pay Drivers if they

6  completed "at least 25-trips from 4/3 to 4/9."  Unbeknownst to Drivers and not disclosed in the

7  Incentive, however, Walmart was not counting deliveries from Walmart's Sam's Club stores as trips

8  eligible to satisfy that Incentive.

Complaint                                                                                Case No. 3:26-cv-1655

**Image 7: Driver Complaint Regarding Incentive**

95.     Walmart itself has recognized that its Incentives have deceived Drivers.  For example, in 2021, when Drivers complained about Walmart's failure to pay promised Referral Incentives, a Walmart employee flagged these complaints for a Spark program manager and remarked that she "agreed with drivers that this is super misleading."  The manager then escalated these complaints to other Spark program managers who agreed that the Incentive language needed to be changed going

forward.  However, nearly two years later, these same managers observed that the issue had still not been fixed and that Drivers were now complaining directly to Walmart's CEO regarding Walmart's failure to accurately disclose the conditions required for Incentive payments.  In one manager's words, Referral Incentives continued to act as a "bait and switch to drivers" because Walmart promised to pay Drivers to recruit others to the Spark platform but failed to tell those Drivers that they would only be paid if the new Driver worked in a particular zone or took deliveries from a particular store.  Drivers have also complained to Walmart's CEO regarding other Incentives that similarly failed to disclose all of the conditions required for payment.

**B.    Walmart Has Regularly Failed to Pay Drivers Even When They Meet All of an Incentive's Conditions**

96.    Second, in addition to failing to disclose all of the necessary conditions to qualify for an Incentive, Walmart also frequently does not pay Drivers even if they successfully complete the Incentive.  This occurs so often that Walmart has monitored it for most of Spark's existence, and refers to it internally as "Incentive Not Tracking."  In other words, Walmart creates Incentives that are, according to Walmart internal documents, "misconfigured," meaning that the backend programming that dictates when a Driver qualifies for the Incentive is not set up properly to pay the Incentive once the Driver has completed the requirements.

97.    As one example of the scope of this problem, in December 2022, Walmart recorded more than 25,000 complaints from Drivers that it classified as "Incentive Not Tracking."  Walmart employees have described Incentives that failed to track correctly as a "train wreck" and an "increased legal risk" due to their failure to track and pay Drivers properly.  In January 2023, a Senior Manager working on Spark collected twenty-two support tickets from Drivers "sent the past couple days" regarding Incentives that had simply failed to track the Driver's progress and forwarded them to an employee responsible for investigating these issues.  These support tickets included instances in which Walmart support agents confirmed that the Driver had completed the requirements (e.g., that the Driver had completed a certain number of qualifying trips or certain types of deliveries), yet Walmart had nevertheless failed to pay the Incentive.

98.    Examples of Walmart's practice of not paying Drivers for completed Incentives are shown below in Images 8 and 9.  In Image 8, in March 2022, a Driver completed four trips in pursuit of an Incentive, but those trips were not reflected in the Driver's Incentive tracker on the app. Walmart's Director in charge of Incentives internally looked into this specific complaint, and opined that he "checked target behavior, comms etc." but found "everything is in line from what I can tell." There was no explanation for why this Driver's trips did not track towards this Incentive.  In Image 9, in February 2024, a Driver complained that, though their Incentive tracker captured that they successfully completed the Incentive requirements, they did not receive the Incentive payment Walmart promised.

| Image 8: Example Incentive Not Tracking | Image 9: Example Incentive Not Paid |

99.    Walmart's representations regarding Incentives are material to Drivers.  Indeed, in 2022, an executive working on Walmart Spark described the failure to pay over 1,000 Drivers for a completed Incentive as a "big miss" that would "destroy … Driver Trust."  In a 2023 survey conducted by Walmart, one Driver commented that Incentives "serve[] as a motivating tool" while

another Driver shared that Incentives "make her do more deliveries." In a different survey that same year, Walmart employees noted that the failure to correctly pay Drivers for completed Incentives constituted an important concern among Drivers. Indeed, "Incentives Not Paid" consistently ranks in the top five issues that Drivers contact Walmart's Spark support agents about.

100.    Drivers reasonably expect to be paid for the Incentives they complete. Accordingly, when Walmart fails to pay out a completed Incentive, support agents routinely receive an influx of calls and contacts from Drivers whose expectations were thwarted. For example, in 2023, support contacts rose by 39% after Walmart did not pay Drivers who completed three Incentives. After Walmart failed to pay one Incentive, a Driver complained to Walmart on February 13, 2023, "this is fraud and shouldn't be allowed," and asked "[w]hy can't Spark live up to the bonus programs they offer the employee? There's no reason we should have to contact Spark customer service everyday [sic] to get our bonuses." In another example, in December 2022, one Driver reported having "called, cha[tt]ed, emailed over 25 times" without any resolution about Walmart's failure to pay a particular Incentive worth $145. It was not until the Driver emailed Walmart's CEO directly that their report was addressed.

101.    Walmart's deceptive misrepresentations regarding Incentives have impacted thousands of Drivers and resulted in millions of dollars in missing or reduced payments. Multiple metrics from 2023 alone demonstrate the pervasiveness of this problem. In February 2023, a Walmart employee reported that, in a single week, over 2,000 Drivers contacted Spark support because Walmart either failed to track the Driver's progress toward an Incentive correctly or failed to pay an Incentive out correctly. In May 2023, a Walmart employee estimated that Incentives were failing to automatically pay out at least $600,000 correctly every month. And, in June 2023, another Walmart employee estimated that at least 24,899 Drivers did not receive the correct Incentive payments in a single week.

**V.    Walmart Deceives Customers with Misrepresentations About Driver Tips**

102.    Apart from representations to Drivers, Walmart also deceptively assures Customers who place a delivery order that "100% of tips go to the driver." In fact, Walmart does not always convey collected tips to the Driver, and on some occasions retains those tips.

103.    Since Spark's inception, Walmart has promised that 100% of Customer tips will go to the Driver.    This representation is widespread, including on Walmart.com's help section for Customers (Image 10), as well as on the delivery order checkout page itself (Image 11).

**Driver Feedback and Tips**

When you get items delivered from the store to your home with Walmart delivery services, you can tip your driver and give feedback on your experience.

**Keep in mind:**

- Tips are optional and 100% go to the driver.
- You can choose to tip before or after placing your order or after delivery.
- You're free to edit your tip amount for up to three hours after delivery.
    - You can add an additional tip for your driver after three hours and up to 24 hours after your order is delivered.
- You have up to 14 days to add a tip for your delivery driver if you didn't a tip when the order was placed.

**Image 10: Walmart.com Customer FAQ**

Driver tip (optional): $4.00 ⓘ
100% of tips go to the drivers

| $2 | $4 | $6 | $0 | Custom |

You can change your tip amount up to 3 hours after delivery. You won't be charged until 24 hours after delivery.

View tip details

**Image 11: Example Walmart.com Delivery Order Checkout Page**

104.    Unfortunately, Walmart has broken that promise.    Tips that Customers leave do not always go to their Drivers.

105.    In August 2021, in response to multiple Driver complaints on social media regarding an unusual number of tips going missing, the head of Spark's Delivery Experience team requested greater visibility into tipping issues.    Accordingly, Walmart began to generate a "Tipping Status Report" documenting several ongoing issues.    As part of this investigation, Walmart determined that there was a $159,000 "delta" over the last six months between tips Walmart had authorized and captured from Customers and what it had paid out to Drivers.    Two months later, in October, a Walmart "deep dive" into problems related to tipping and payouts—in an email chain tiled "Spark

Pre-Tipping 911"—found that $199,000 of tips were "invoiced but not paid" in just the last week of September.  In response, the Director of Insights and Analytics for Spark summarized the issue for her colleagues: "[n]et net is that we are still having the occurrence of customers placing & charged for tips and drivers are not paid."

106.    These issues have persisted in various forms throughout the operation of Spark.  For example, in May 2023, Walmart tested having Walmart employees deliver certain orders.  Walmart's employees were not permitted to earn money driving for Spark, including Customer tips; however, Walmart still charged Customers for their tips, despite their Drivers not receiving these tip amounts. Thus, in its internal team workspace, Walmart acknowledged that it ran "a net positive tip balance […] which puts Walmart into the legal risk."  Similarly, in August 2023, the head of Spark's Driver Experience team was informed that Customers were being charged before Walmart's internal systems recognized that the order had been delivered, resulting in tips being collected but not "paid out systematically" to Drivers.  In fact, when a Senior Manager for Spark's Operations and Driver Experience team collected and organized a list of the 25 biggest defects affecting Spark on January 31, 2024, the issue of "Customer charged tips that driver did not receive, did [n]ot refund to customer either" made the list, with an estimated support volume of 700 tickets opened every week in response to complaints.

107.    Accordingly, despite their representation that tips go entirely to the Drivers, Walmart has charged Customers for tips they left for Drivers but failed to deliver these tips to the Drivers.

## VI.    Walmart Uses False Representations to Obtain Drivers' Financial Information and to Cause Drivers to Disclose Their Financial Information

108.    Walmart uses the false representations to Drivers set forth above to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed, their financial information.

109.    When it advertises the opportunity to become a Spark Driver, Walmart tells potential Drivers that "[y]ou get to keep 100% of customer confirmed tips."  It tells them that "[e]ach offer will list the estimated amount you will receive for making the delivery."  And it advertises to potential Drivers that they can "boost your earnings by meeting the incentive program qualifications, such as completing a certain number of trips in a specific time period."  Walmart makes these representations

on its website and in promotional materials and targeted notices that it uses to entice Drivers to sign up for Spark.  As discussed above, in numerous instances, these representations about the tips, base pay, and Incentives Drivers will earn are false: Drivers often do not keep 100% of customer-confirmed tips; Offers often advertise earnings Walmart knows Drivers will never receive; and Drivers often do not receive promised Incentive payments despite meeting program qualifications represented to them.

110.    When consumers sign up to become Spark Drivers, Walmart requires them to provide their financial information, either by setting up direct deposit (by providing their individual bank account numbers and routing numbers) or by connecting certain digital wallet accounts.  In each of these cases, consumers must provide Walmart with their customer information of a financial institution to work for Spark as Drivers.

***

111.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission. Defendant engaged in these unlawful acts and practices repeatedly over a period of several years. Defendant earned significant revenues and/or saved significant costs by participating in these unlawful acts and practices.  And Defendant continued its unlawful acts or practices despite knowledge of thousands of complaints from Drivers regarding these issues.

**VIOLATIONS OF THE FTC ACT**

112.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

113.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**Count I (by Plaintiff FTC)**

**(Misrepresentations to Drivers Regarding Tips)**

114.    In numerous instances in connection with the advertising, marketing, promotion, or operation of Spark, Defendant represents and has represented, directly or indirectly, expressly or by

1    implication, that Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card if the

2    Driver completes the delivery and the Customer does not affirmatively change the pre-tip.

3        115.    In fact, in numerous instances in which Defendant makes this representation,

4    Defendant does not disburse the tip amount shown in the Offer Card, even though the Driver

5    completes the delivery and the Customer does not affirmatively change the pre-tip.

6        116.    Therefore, Defendant's representations are false or misleading and constitute a

7    deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

8                          **Count II (by Plaintiff FTC)**

9                  **(Misrepresentations to Drivers Regarding Base Pay)**

10        117.    In numerous instances in connection with the advertising, marketing, promotion, or

11    operation of Spark, Defendant represents and has represented, directly or indirectly, expressly or by

12    implication, that Defendant will pay Drivers the base pay amount shown in the Offer Card.

13        118.    In fact, in numerous instances in which Defendant makes this representation,

14    Defendant fails to pay Drivers the base pay amount shown in the Offer Card.

15        119.    Therefore, Defendant's representations are false or misleading and constitute a

16    deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

17                          **Count III (by Plaintiff FTC)**

18                  **(Misrepresentations to Drivers Regarding Incentives)**

19        120.    In numerous instances in connection with the advertising, marketing, promotion, or

20    operation of Spark, Defendant represents and has represented, directly or indirectly, expressly or by

21    implication, that Defendant will provide a Driver who fulfills an Incentive's stated program

22    qualifications the stated Incentive payment.

23        121.    In fact, in numerous instances in which Defendant makes this representation,

24    Defendant does not pay a Driver the stated Incentive payment after the Driver fulfills the Incentive's

25    stated  program qualifications.

26        122.    Therefore, Defendant's representations are false or misleading and constitute a

27    deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

28

**Count IV (by Plaintiff FTC)**

**(Misrepresentations to Customers Regarding Tips)**

123.    In numerous instances in connection with the advertising, marketing, promotion, of operation of Spark, Defendant represents and has represented, directly or indirectly, expressly or by implication, that Drivers will receive 100% of the tips left by Customers.

124.    In fact, in numerous instances in which Defendant makes this representation, Defendant charges Customers for tips but fails to provide those tips to Drivers.

125.    Therefore, Defendant's representations are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT**

126.    Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect.  Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain, or caus[ing] to be disclosed or attempt[ing] to cause to be disclosed to any person, customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

127.    The GLB Act defines "customer" to mean, "with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary."  15 U.S.C. § 6827(1).  The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of a financial institution and is identified with the customer."  *Id.* § 6827(2).  The GLB Act defines a "financial institution" as "any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution."  *Id.* § 6827(4)(A).

128.    Section 522(a) of the GLB Act, *id.* § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."

- 37 -

1    Pursuant to Section 814(a) of the FDCPA, *id.* § 1692*l*(a), a violation of the FDCPA is deemed an

2    unfair or deceptive act or practice in violation of the FTC Act. Section 814(a) of the FDCPA further

3    provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC

4    to enforce compliance by any person with the FDCPA, including the power to enforce provisions of

5    the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation

6    rule. Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section 521 of the GLB

7    Act in the same manner as if a violation of the GLB Act were a violation of an FTC trade regulation

8    rule.

9        129.    Section 19 of the FTC Act, *id.* § 57b, authorizes this Court to grant such relief as the

10    Court finds necessary to redress injury to consumers resulting from Defendant's violations of the

11    GLB Act, including, but not limited, to the rescission or reformation of contracts, and the refund of

12    money or return of property.

13                              **Count V (by Plaintiff FTC)**

14    **(Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain, or Cause**

15        **to Be Disclosed or Attempt to Cause to Be Disclosed, Customer Information of a Financial**

16                                    **Institution)**

17        130.    In numerous instances in connection with the advertising, marketing, promotion, or

18    operation of Spark, Defendant makes and has made false, fictitious, or fraudulent statements or

19    representations to customers of financial institutions to obtain or attempt to obtain, or to cause to be

20    disclosed or attempt to cause to be disclosed, customer information of a financial institution, such as

21    bank account numbers, including by representing, directly or indirectly, expressly or by implication,

22    that Drivers:

23                A.    Will be paid 100% of the Customer-confirmed tips;

24                B.    Will be paid the earnings that Defendant displays in Offer Cards; and

25                C.    Will be paid Incentive earnings upon meeting the Incentive's requirements.

26        131.    Therefore, Defendant's acts or practices set forth above violate Section 521 of the

27    GLB Act, 15 U.S.C. § 6821, and constitute deceptive acts or practices in violation of Section 5(a) of

28    the FTC Act, 15 U.S.C. § 45(a).

1

**VIOLATIONS OF ARIZONA STATE LAW**

2

**Count VI (by Plaintiff State of Arizona)**

3

**Violations of the Arizona Consumer Fraud Act**

4      132.    The conduct described in the preceding paragraphs of this Complaint constitutes

5    deception, deceptive or unfair acts or practices, fraud, false pretenses, false promises,

6    misrepresentations, or concealment, suppression or omission of material facts with intent that others

7    rely on such concealment, suppression or omission, in connection with the sale or advertisement of

8    merchandise in violation of A.R.S. §§ 44-1521–1534, including, but not limited to:

9              A.    Defendant engaged in deceptive and unfair acts and practices by representing

10                   to Arizona consumers, directly or indirectly, expressly or by implication, that

11                   it will disburse to Drivers the pre-tip amount shown in the Offer Card if the

12                   Drivers complete the delivery and the Customer does not affirmatively change

13                   the pre-tip.  In fact, in numerous instances, Defendant does not disburse to

14                   Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the

15                   delivery even when the Customer does not affirmatively change the pre-tip;

16             B.    Defendant engaged in deceptive and unfair acts and practices by representing

17                   to Arizona consumers, directly or indirectly, expressly or by implication, that

18                   it will pay Drivers the base pay amount shown in the Offer Card.  In fact, in

19                   numerous instances, Defendant does not pay Drivers the base pay amount

20                   shown in the Offer Card;

21             C.    Defendant engaged in deceptive and unfair acts and practices by representing

22                   to Arizona consumers, directly or indirectly, expressly or by implication, that

23                   it will provide a Driver who fulfills an Incentive's stated requirements the

24                   stated Incentive payment.  In fact, in numerous instances, Defendant does not

25                   pay Drivers the Incentive payment after they fulfill the Incentive's stated

26                   requirements;

27             D.    Defendant engaged in deceptive and unfair acts and practices by representing

28                   to Arizona consumers, directly or indirectly, expressly or by implication, that

- 39 -

Drivers will receive 100% of the tips left by Customers; Defendant, in numerous instances, has charged Customers for tips but failed to provide those tips to Drivers.

133.     While engaging in the acts and practices alleged in this Complaint, Defendant knew or should have known that its conduct was of the nature prohibited by A.R.S. § 44-1522, subjecting itself to enforcement and penalties as provided in A.R.S. § 44-1531(A).

134.     With respect to the concealments, suppressions, or omissions of material fact described above, Defendant did so with intent that others rely on such concealments, suppressions, or omissions.

### VIOLATIONS OF CALIFORNIA STATE LAW

### Count VII (by Plaintiff Alameda County District Attorney on behalf of the People of the State of California)

### Violations of California Business and Professions Code Sections 17500 *et seq.*

135.     In numerous instances in connection with the advertising, marketing, promotion, or operation of Spark, Defendant has represented, directly or indirectly, expressly or by implication, that:

A.     Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery and the Customer does not affirmatively change the pre-tip;

B.     Defendant will pay Drivers the base pay amount shown in the Offer Card;

C.     Defendant will provide a Driver who fulfills an Incentive's stated requirements the stated Incentive payment; and

D.     Drivers will receive 100% of the tips left by Customers.

136.     In fact, in numerous instances when Defendant makes these representations:

A.     Defendant does not disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery even when the Customer does not affirmatively change the pre-tip;

B.     Defendant does not pay Drivers the base pay amount shown in the Offer Card;

- 40 -

C.    Defendant does not pay Drivers the promised Incentive payment after they fulfill the Incentive's stated requirements; and

D.    Defendant has charged Customers for tips but failed to provide those tips to Drivers.

137.    Therefore, within three years preceding the filing of this Complaint, Defendant made untrue and/or misleading statements to the public in violation of California Business and Professions Code § 17500.

**Count VIII (by Plaintiff Alameda County District Attorney on behalf of the People of the State of California)**

**Violations of California Business and Professions Code Sections 17200 *et seq.***

138.    Within four years preceding the filing of this Complaint, Defendant violated California Business and Professions Code § 17200 by engaging in business acts or practices that were unlawful, unfair, deceptive, or misleading, including, but not limited to, the following acts or practices:

A.    Violating California Business and Professions Code § 17500;

B.    Violating Section 5 of the FTC Act, 15 U.S.C. § 45(a); and

C.    Violating Section 521 of the GLB Act, 15 U.S.C. § 6821.

**VIOLATIONS OF COLORADO STATE LAW**

139.    The CCPA prohibits unfair or deceptive trade practices. Col. Rev. Stat. § 6-1-105. The Attorney General is authorized to enforce the CCPA under Colo. Rev. Stat. § 6-1-103.

**Count IX (by Plaintiff Attorney General of Colorado )**

**Violations of the CCPA – False or Misleading Statements of Fact**

140.    In numerous instances in connection with the advertising, marketing, promotion, or operation of Spark, Defendant has represented, directly or indirectly, expressly or by implication, that:

A.    Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery and the Customer does not affirmatively change the pre-tip;

- 41 -

1              B.      Defendant will pay Drivers the base pay amount shown in the Offer Card;

2              C.      Defendant will provide a Driver who fulfills an Incentive's stated requirements

3                       the stated Incentive payment; and

4              D.      Drivers will receive 100% of the tips left by Customers.

5     141.    In fact, in numerous instances when Defendant makes these representations:

6              A.      Defendant does not disburse to Drivers the pre-tip amount shown in the Offer

7                       Card if the Drivers complete the delivery even when the Customer does not

8                       affirmatively change the pre-tip;

9              B.      Defendant does not pay Drivers the base pay amount shown in the Offer Card;

10             C.      Defendant does not pay Drivers the promised Incentive payment after they

11                       fulfill the Incentive's stated requirements; and

12             D.      Defendant has charged Customers for tips but failed to provide those tips to

13                       Drivers.

14     142.    These representations are knowingly or recklessly false or misleading and are thus a

15 violation of the CCPA, Colo. Rev. Stat. § 6-1-105(1)(l).

16                  **Count X (by Plaintiff Attorney General of Colorado)**

17     **Violations of the CCPA – Engaging in an Unfair, Unconscionable, or Deceptive Practice**

18     143.    In numerous instances in connection with the advertising, marketing, promotion, or

19 operation of Spark, Defendant has represented, directly or indirectly, expressly or by implication,

20 that:

21              A.      Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card

22                       if the Drivers complete the delivery and the Customer does not affirmatively

23                       change the pre-tip;

24              B.      Defendant will pay Drivers the base pay amount shown in the Offer Card;

25             C.      Defendant will provide a Driver who fulfills an Incentive's stated requirements

26                       the stated Incentive payment; and

27              D.      Drivers will receive 100% of the tips left by Customers.

28     144.    In fact, in numerous instances when Defendant makes these representations:

A.      Defendant does not disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery even when the Customer does not affirmatively change the pre-tip;

B.      Defendant does not pay Drivers the base pay amount shown in the Offer Card;

C.      Defendant does not pay Drivers the promised Incentive payment after they fulfill the Incentive's stated requirements; and

D.      Defendant has charged Customers for tips but failed to provide those tips to Drivers.

145.    Defendant's business practice of misrepresenting base pay, tips, and incentives is knowingly or recklessly unfair, unconscionable, and deceptive and violates the CCPA, Colo. Rev. Stat. § 6-1-105(1)(rrr).

## VIOLATIONS OF ILLINOIS STATE LAW

### The Illinois Consumer Fraud Act

146.    Section 2 of the Illinois Consumer Fraud Act provides the following:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August, 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2

147.    Section 7 of the Illinois Consumer Fraud Act provides:

(a) Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice.  The Court, in its discretion, may exercise all powers necessary, including by not limited to: injunction,

- 43 -

revocation, forfeiture or suspension of any license, charger, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver, dissolution of domestic corporations or association suspension or termination of the right of foreign corporation or associations to do business in this State; and restitution.

(b) In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act.  In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

(c) In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

815 ILCS 505/7.

148.    Section 10 of the Illinois Consumer Fraud Act provides, "In any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State." 815 ILCS 505/10.

**Illinois Uniform Deceptive Trade Practices Act**

149.    Section 2 of the Illinois Uniform Deceptive Trade Practices Act provides, in relevant part, the following:

A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: * * * (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of good or services; (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; * * * (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; * * * (11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/2(a)

1
2
> In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

3  815 ILCS 510/2(b).

4  **Count XI (by Plaintiff State of Illinois)**

5  **Violations of the Illinois Consumer Fraud Act**

6  150.   The Illinois Attorney General re-alleges and incorporates by reference each and every
7  allegation set forth in the foregoing paragraphs.

8  151.   Defendant, in the course of trade or commerce, has in numerous instances engaged in
9  conduct which constitutes unfair and deceptive acts or practices declared unlawful under section 2 of
10  the Illinois Consumer Fraud Act, 815 ILCS 505/2, by:

11      A.   Misrepresenting directly or indirectly, expressly or by implication, the tips
12          Drivers would earn for completing a given delivery;

13      B.   Misrepresenting directly or indirectly, expressly or by implication, the base
14          pay Drivers would earn for completing a given delivery;

15      C.   Misrepresenting directly or indirectly, expressly or by implication, the
16          Incentives Drivers could earn by fulfilling a requirement or set of
17          requirements;

18      D.   Misrepresenting directly or indirectly, expressly or by implication, Drivers'
19          potential total earnings by advertising certain amounts to Drivers and then
20          failing to pay those amounts;

21      E.   Misrepresenting directly or indirectly, expressly or by implication, through
22          advertisements, marketing, and offers for delivery to Customers in Illinois that
23          100% of a Customer's tips will be paid to the Driver.

24  **Count XII (by Plaintiff State of Illinois)**

25  **Violations of the Illinois Uniform Deceptive Trade Practices Act**

26  152.   Defendant, in the course of a business, vocation, or occupation, has in numerous
27  instances engaged in deceptive trade practices in violation of Section 2 of the Illinois Uniform
28  Deceptive Trade Practices Act, 815 ILCS 510/2, by:

- 45 -

A.    Advertising tips to Drivers that Walmart knew or should have known it would not provide, causing a likelihood of confusion or misunderstanding among Illinois Drivers, in violation of 815 ILCS 510/2(a)(12).

B.    Advertising base pay to Drivers that Walmart knew or should have known it would not pay, causing a likelihood of confusion or misunderstanding among Illinois Drivers, in violation of 815 ILCS 510/2(a)(12).

C.    Advertising Incentives to Drivers that Walmart knew or should have known it would not pay, causing a likelihood of confusion or misunderstanding among Illinois Drivers, in violation of 815 ILCS 510/2(a)(12).

D.    Representing to consumers that Walmart will pay 100% of their tip to the Driver who delivers their order, causing a likelihood of confusion or misunderstanding as to the affiliation, connection, association with or certification by the Driver, in violation of 815 ILCS 510/2(a)(3).

E.    Representing to consumers that Walmart will pay 100% of their tip to the Driver who delivers their order, causing a likelihood of confusion or misunderstanding among Illinois Customers who place orders that are delivered through Spark, in violation of 815 ILCS 510/2(a)(12).

**VIOLATIONS OF MICHIGAN STATE LAW**

**Count XIII (by Plaintiff People of Michigan)**

**Violations of the Michigan Consumer Protection Act**

153.    The Michigan Attorney General is authorized to bring this claim under Mich. Comp. Laws §§ 445.905 and 445.910.  The Attorney General may obtain injunctive relief, actual damages, and other appropriate relief under the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 *et seq.*

154.    As described in this Complaint, Defendant has engaged in the following unfair, unconscionable, and deceptive trade practices that are made unlawful under the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903(1):

(g) Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented;

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;

(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and

(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

155.    In numerous instances in connection with the advertising, marketing, promotion, or operation of Spark, Defendant has represented, directly or indirectly, expressly or by implication, that:

A.    Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery and the Customer does not affirmatively change the pre-tip;

B.    Defendant will pay Drivers the base pay amount shown in the Offer Card;

C.    Defendant will provide a Driver who fulfills an Incentive's stated requirements the stated Incentive payment; and

D.    Drivers will receive 100% of the tips left by Customers.

156.    In truth and in fact, in numerous instances when Defendant makes these representations:

A.    Defendant does not disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery even when the Customer does not affirmatively change the pre-tip;

B.    Defendant does not pay Drivers the base pay amount shown in the Offer Card;

C.    Defendant does not pay Drivers the promised Incentive payment after they fulfill the Incentive's stated requirements; and

- 47 -

D.    Defendant has charged Customers for tips but failed to provide those tips to Drivers.

157.    Therefore, these representations and practices as set forth above are unfair, unconscionable, and deceptive trade practices that are made unlawful under the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903(1).

### VIOLATIONS OF NORTH CAROLINA STATE LAW

158.    N.C.G.S. § 75-1.1 prohibits "unfair or deceptive acts or practices in or affecting commerce."

159.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by N.C.G.S. § 75-1.1.

160.    Acts or practices are unfair under N.C.G.S. § 75-1.1 when they offend established public policy, as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

### Count XIV (by Plaintiff State of North Carolina)

### Violations of North Carolina Unfair or Deceptive Trade Practices Act

161.    In numerous instances in connection with the advertising, marketing, promotion, or operation of Spark, Defendant has represented, directly or indirectly, expressly or by implication, that:

A.    Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery and the Customer does not affirmatively change the pre-tip;

B.    Defendant will pay Drivers the base pay amount shown in the Offer Card;

C.    Defendant will provide a Driver who fulfills an Incentive's stated requirements the stated Incentive payment; and

D.    Drivers will receive 100% of the tips left by Customers.

162.    In truth and in fact, in numerous instances when Defendant makes these representations:

      A.     Defendant does not disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery even when the Customer does not affirmatively change the pre-tip;

      B.     Defendant does not pay Drivers the base pay amount shown in the Offer Card;

      C.     Defendant does not pay Drivers the promised Incentive payment after they fulfill the Incentive's stated requirements; and

      D.     Defendant has charged Customers for tips but failed to provide those tips to Drivers.

163.    Therefore, Defendant's representations are false or misleading and constitute unfair or deceptive trade practices, are prohibited by N.C.G.S. § 75-1.1, and are in violation of North Carolina's Unfair or Deceptive Trade Practices Act.

## VIOLATIONS OF OKLAHOMA STATE LAW

### Count XV (by Plaintiff State of Oklahoma)

### Violations of Oklahoma Consumer Protection Act - Deception

164.    The Oklahoma Consumer Protection Act prohibits businesses from engaging in any "deceptive trade practice[s]," which are defined as any "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."  15 O.S. § 752(13).

165.    Defendant has engaged and continues to engage in "consumer transactions" as that term is defined in the Oklahoma Consumer Protection Act with tens of thousands of Oklahomans.

166.    As described in this Complaint, Defendant has repeatedly deceived consumers through its words, conduct, silence, and action—in violation of the Oklahoma Consumer Protection Act.

167.    By making express and implied material misrepresentations about tips, base pay, and incentives, Defendant has engaged in deceptive trade practices that are prohibited by the Oklahoma Consumer Protection Act.

168.    Each instance of Defendant's deceptive practices constitutes a separate violation of the Oklahoma Consumer Protection Act.

**Count XVI (by Plaintiff State of Oklahoma)**

**Violations of Oklahoma Consumer Protection Act - Unfairness**

169.    The Oklahoma Consumer Protection Act prohibits businesses from knowingly engaging in "unfair" trade practices, which are defined as any practice "which offends established public policy" or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." 15 O.S. § 752(14).

170.    Defendant has engaged and continues to engage in "consumer transactions" as that term is defined in the Oklahoma Consumer Protection Act with tens of thousands of Oklahomans.

171.    By failing to pay promised tips, base pay, and incentives, Defendant has engaged in unfair trade practices prohibited by the Oklahoma Consumer Protection Act.

172.    Through their conduct, Defendant has injured tens of thousands of Oklahomans.

173.    Each instance of Defendant's unfair practices constitutes a separate violation of the Oklahoma Consumer Protection Act.

174.    Insofar as there are positive benefits associated with Defendant's conduct, those benefits do not outweigh the harm arising out of Defendant's conduct.

**VIOLATIONS OF PENNSYLVANIA STATE LAW**

175.    Section 201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law defines "trade" and "commerce" to mean the "advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."

176.    Defendant has engaged in trade and commerce in the Commonwealth of Pennsylvania by marketing and operating the Spark platform within the Commonwealth of Pennsylvania and using the Spark platform to sell and deliver goods to Pennsylvania consumers.

177.    Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of Section 201-2(4) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law are declared unlawful, and whenever the Attorney General has reason to believe that any person is using or is about to use any

- 50 -

method, act, or practice declared unlawful, Section 201-4 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law authorizes the Attorney General to bring an action against such person to restrain these methods, acts, or practices.

178.    The acts and practices described below constitute unfair methods of competition or unfair or deceptive acts or practices, as prohibited by Section 201-3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law as defined by subclauses (v), (xi), (xii), and (xxi) of Section 201-2(4) as follows:

> A.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have, 73 P.S. § 201-2(4)(v);
>
> B.    Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions, 73 P.S. § 201-2(4)(xi);
>
> C.    Promising or offering prior to time of sale to pay, credit or allow to any buyer, any compensation or reward for the procurement of a contract for purchase of goods or services with another or others, or for the referral of the name or names of another or others for the purpose of attempting to procure or procuring such a contract of purchase with such other person or persons when such payment, credit, compensation or reward is contingent upon the occurrence of an event subsequent to the time of the signing of a contract to purchase, 73 P.S. § 201-2(4)(xii); and
>
> D.    Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

**Count XVII (by Plaintiff Commonwealth of Pennsylvania)**

**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**

179.    In numerous instances in connection with the advertising, marketing, promotion, or operation of Spark, Defendant has represented, directly or indirectly, expressly or by implication, that:

- 51 -

A.    Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery and the Customer does not affirmatively change the pre-tip;

B.    Defendant will pay Drivers the base pay amount shown in the Offer Card;

C.    Defendant will provide a Driver who fulfills an Incentive's stated requirements the stated Incentive payment; and

D.    Drivers will receive 100% of the tips left by Customers.

180.    In truth and in fact, in numerous instances when Defendant makes these representations:

A.    Defendant does not disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery even when the Customer does not affirmatively change the pre-tip;

B.    Defendant does not pay Drivers the base pay amount shown in the Offer Card;

C.    Defendant does not pay Drivers the promised Incentive payment after they fulfill the Incentive's stated requirements; and

D.    Defendant has charged Customers for tips but failed to provide those tips to Drivers.

181.    Defendant has therefore engaged in unfair or deceptive acts or practices in violation of 73 P.S. § 201-3 and defined by at least 73 P.S. § 201-2(4)(v), (xi), (xii), and (xxi).

## VIOLATIONS OF SOUTH CAROLINA STATE LAW

### Count XVIII (by Plaintiff State of South Carolina)

### Violations of the South Carolina Unfair Trade Practices Act

182.    By engaging in the acts and practices alleged herein, Defendant made or caused to be made to South Carolina consumers, directly or indirectly, explicitly or by implication, misrepresentations that, reasonably interpreted, are material, false, and likely to mislead.

183.    Specifically, in numerous instances in connection with the advertising, marketing, promotion, or operation of Spark, Defendant has represented, directly or indirectly, expressly or by implication, that:

A.     Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery and the Customer does not affirmatively change the pre-tip;

B.     Defendant will pay Drivers the base pay amount shown in the Offer Card;

C.     Defendant will provide a Driver who fulfills an Incentive's stated requirements the stated Incentive payment; and

D.     Drivers will receive 100% of the tips left by Customers.

184.    In truth and in fact, in numerous instances when Defendant makes these representations:

A.     Defendant does not disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery even when the Customer does not affirmatively change the pre-tip;

B.     Defendant does not pay Drivers the base pay amount shown in the Offer Card;

C.     Defendant does not pay Drivers the promised Incentive payment after they fulfill the Incentive's stated requirements; and

D.     Defendant has charged Customers for tips but failed to provide those tips to Drivers.

185.    Defendant's acts and practices regarding South Carolina consumers as alleged in this Complaint are offensive to established public policy, immoral, and unethical.

186.    These acts and practices have resulted in a substantial injury to South Carolina consumers that is not outweighed by any countervailing benefits to consumers or competition.

187.    At the time it made or disseminated its false or misleading statements or caused those statements to be made or disseminated, Defendant knew or should have known that the statements were false or misleading and therefore likely to deceive the public.

188.    Defendant's acts and practices regarding South Carolina consumers as alleged herein are capable of repetition and affect the public interest.

189.    Defendant's acts and practices regarding South Carolina consumers as alleged herein occurred in the conduct of trade and/or commerce.

Complaint                                                                                    Case No. 3:26-cv-1655

190.    Every deceptive, unfair, and/or misrepresentative act by Defendant constitutes a separate and distinct violation of S.C. Code § 39-5-20.

191.    Defendant's acts and practices regarding South Carolina consumers as alleged herein are willful under S.C. Code § 39-5-110, subjecting the Defendant to a civil penalty of up to $5,000 per violation of S.C. Code § 39-5-20.

## VIOLATIONS OF UTAH STATE LAW

192.    The Utah Consumer Sales Practices Act prohibits suppliers from committing deceptive and unconscionable acts or practices in connection with a consumer transaction, whether the act occurs before, during, or after the transaction.  Utah Code §§ 13-11-4(1); 13-11-5(1).

193.    Defendant engages in "consumer transaction[s]" by marketing and/or selling to "person[s]" products and services that are primarily for personal, family, or household purposes, or for purposes that relate to a business opportunity.  Utah Code § 13-11-3(2).

194.    Defendant is a "supplier" because they regularly solicit, engage in, or enforce consumer transactions whether or not they deal directly with consumers. Utah Code § 13-11-3(5).

195.    As set forth below, Defendant has violated the Utah Consumer Sales Practices Act by engaging in deceptive and unconscionable acts and practices in connection with the marketing and sale of its Spark Driver program.

### Count XIX (by Plaintiff Utah Division of Consumer Protection)

### Violations of the Utah Consumer Sales Practices Act

196.    In numerous instances in connection with the advertising, marketing, promotion, or operation of Spark, Defendant has represented, directly or indirectly, expressly or by implication, that:

   A.    Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery and the Customer does not affirmatively change the pre-tip;

   B.    Defendant will pay Drivers the base pay amount shown in the Offer Card;

   C.    Defendant will provide a Driver who fulfills an Incentive's stated requirements the stated Incentive payment; and

- 54 -

1      D.      Drivers will receive 100% of the tips left by Customers.

2      197.    In truth and in fact, in numerous instances when Defendant makes these

3  representations:

4      A.      Defendant does not disburse to Drivers the pre-tip amount shown in the Offer

5              Card if the Drivers complete the delivery even when the Customer does not

6              affirmatively change the pre-tip;

7      B.      Defendant does not pay Drivers the base pay amount shown in the Offer Card;

8      C.      Defendant does not pay Drivers the promised Incentive payment after they

9              fulfill the Incentive's stated requirements; and

10     D.      Defendant has charged Customers for tips but failed to provide those tips to

11             Drivers.

12     198.    Therefore, Defendant's representations as set forth above are false and misleading and

13  constitute deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Utah

14  Code § 13-11-4(1).

15                    **VIOLATIONS OF WISCONSIN STATE LAW**

16     199.    Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18(1), generally prohibits

17  untrue, deceptive, or misleading representations.  Specifically, as related to this action, Wis. Stat. §

18  100.18(1) provides that no person may, for the purpose of increasing the consumption of employment,

19  make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be

20  made, published, disseminated, circulated, or placed before the public, any statement or

21  representation that is untrue, deceptive, or misleading.

22                    **Count XX (by Plaintiff State of Wisconsin)**

23                **Violations of Wisconsin Deceptive Trade Practices Act**

24     200.    In numerous instances in connection with the advertising, marketing, promotion, or

25  operation of Spark, Defendant has represented, directly or indirectly, that:

26     A.      Defendant will disburse to Drivers the pre-tip amount shown in the Offer Card

27             if the Drivers complete the delivery and the Customer does not affirmatively

28             change the pre-tip;

B.    Defendant will pay Drivers the base pay amount shown in the Offer Card;

C.    Defendant will provide a Driver who fulfills an Incentive's stated requirements the stated Incentive payment; and

D.    Drivers will receive 100% of the tips left by Customers.

201.    In truth and in fact, in numerous instances when Defendant makes these representations:

A.    Defendant does not disburse to Drivers the pre-tip amount shown in the Offer Card if the Drivers complete the delivery even when the Customer does not affirmatively change the pre-tip;

B.    Defendant does not pay Drivers the base pay amount shown in the Offer Card;

C.    Defendant does not pay Drivers the promised Incentive payment after they fulfill the Incentive's stated requirements; and

D.    Defendant has charged Customers for tips but failed to provide those tips to Drivers.

202.    Therefore, Defendant's representations are untrue, deceptive, or misleading, and are in violation of Wisconsin's Deceptive Trade Practices Act.

**CONSUMER INJURY**

203.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act, the GLB Act, the Arizona Consumer Fraud Act, the California False Advertising Law, the California Unfair Competition Law, the Colorado Consumer Protection Act, the Illinois Uniform Deceptive Trade Practices Act, the Illinois Consumer Fraud Act, the Michigan Consumer Protection Act, the North Carolina Unfair or Deceptive Trade Practices Act, the Oklahoma Consumer Protection Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, the South Carolina Unfair Trade Practices Act, the Utah Consumer Sales Practices Act, and the Wisconsin Deceptive Trade Practices Act.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

- 56 -

A.     Enter a permanent injunction to prevent future violations of the FTC Act, the GLB Act, the Arizona Consumer Fraud Act, the California False Advertising Law, the California Unfair Competition Law, the Colorado Consumer Protection Act, the Illinois Consumer Fraud Act, the Illinois Uniform Deceptive Trade Practices Act, the Michigan Consumer Protection Act, the North Carolina Unfair or Deceptive Trade Practices Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, the Oklahoma Consumer Protection Act, the South Carolina Unfair Trade Practices Act, the Utah Consumer Sales Practices Act, and the Wisconsin Deceptive Trade Practices Act;

B.     Grant preliminary injunctive and ancillary relief to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

C.     Award monetary and other relief within the Court's power to grant;

D.     Award Plaintiffs the costs of bringing this action, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper; and

E.     Award Plaintiff States civil penalties and/or forfeitures for each violation of their respective state laws, attorneys' fees, and expenses as provided under state law.

Dated: February 26, 2026                         Respectfully submitted,

**FOR PLAINTIFF THE FEDERAL TRADE COMMISSION:**

/s/ Aaron M. Schue
AARON M. SCHUE, SBN 338760
JORDAN X. NAVARRETTE, SBN 306143
MILES D. FREEMAN, SBN 299302
DAVID L. HANKIN, SBN 319825
BARBARA CHUN, SBN 186907
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for Plaintiff Federal Trade Commission*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR PLAINTIFF THE STATE OF ARIZONA:**

KRIS MAYES
Attorney General of the State of Arizona

*/s/ Jayme L. Weber*

JAYME L. WEBER, SBN 330107
Office of the Attorney General
Civil Litigation Division
400 W. Congress St., Ste. S-215
Tucson, AZ 85701
Tel: (602) 542-5025
Fax: (602) 542-4377

*Attorney for Plaintiff the State of Arizona*

- 58 -

**FOR PLAINTIFF THE PEOPLE OF THE STATE OF CALIFORNIA:**

URSULA JONES DICKSON
District Attorney

*/s/ Andres H. Perez*
ANDRES H. PEREZ, SBN 186219
Office of the Alameda County District Attorney
1225 Fallon Street, Suite 900
Oakland, CA 94612
Tel: (510) 272-6222
Fax: (510) 271-5157

*Attorney for Plaintiff the People of the State of California*

- 59 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR PLAINTIFF ATTORNEY GENERAL OF COLORADO:**

PHILIP J. WEISER
Colorado Attorney General

*/s/Julianne B. Cramer*
JULIANNE B. CRAMER, CA SBN 227771
Consumer Protection Section
1300 Broadway, 9th Floor
Denver, CO 80203
Tel: (720) 508-6000
Fax: (720) 508-6040

*Attorney for Plaintiff Attorney General of Colorado*

- 60 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR PLAINTIFF THE PEOPLE OF THE STATE OF ILLINOIS:**

KWAME RAOUL
Attorney General

*/s/ William S. Wingo*

WILLIAM S. WINGO, *pro hac vice forthcoming or pending*
WILTON A. PERSON, *pro hac vice forthcoming or pending*
Office of the Illinois Attorney General
Consumer Fraud Bureau
115 S. LaSalle Street, 26th Floor
Chicago, Illinois 60603
Tel: (312) 814-3000
Fax: (312) 814-3806

*Attorneys for Plaintiff the People of the State of Illinois*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR PLAINTIFF THE PEOPLE OF THE STATE OF MICHIGAN:**

DANA NESSEL
Michigan Attorney General

*/s/ Aaron W. Levin*

AARON W. LEVIN, *pro hac vice forthcoming or pending*
Michigan Department of Attorney General
Corporate Oversight Division
525 W. Ottawa Street
P.O. Box 30736
Lansing, MI 48909
Tel: (517) 335-7632
Fax: (517) 335-6755

*Attorney for Plaintiff the People of State Michigan*

- 62 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR PLAINTIFF THE STATE OF NORTH CAROLINA:**

JEFF JACKSON
North Carolina Attorney General

*/s/ Jesse Ramos*
JESSE RAMOS, *pro hac vice forthcoming or pending*
North Carolina Department Of Justice
Post Office Box 629
Raleigh, NC 27602
Tel: (919) 716-6000
Fax: (919) 716-6050

*Attorney for Plaintiff the State of North Carolina*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR PLAINTIFF THE STATE OF OKLAHOMA:**

GENTNER DRUMMOND
Attorney General of Oklahoma

*/s/ Cameron Capps*

CAMERON CAPPS, *pro hac vice forthcoming or pending*
Oklahoma Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Tel: (405) 521-3921
Fax: (405) 521-6246

*Attorney for Plaintiff the State of Oklahoma*

- 64 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:**

DAVID W. SUNDAY, JR.
Attorney General for the Commonwealth of Pennsylvania

*/s/ John M. Abel*

JOHN M. ABEL, *pro hac vice forthcoming or pending*
Pennsylvania Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Tel: (717) 497-5123
Fax: (717) 705-3795

FRANCESCA MILLER-SURMAN, *pro hac vice forthcoming or pending*
Pennsylvania Office of Attorney General
1251 Waterfront Place, Mezzanine Level
Pittsburgh, PA 15222
Tel: (412) 565-7680
Fax: (412) 565-3019

*Attorneys for Plaintiff Commonwealth of Pennsylvania*

Complaint                                                                 Case No. 3:26-cv-1655

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR PLAINTIFF THE STATE OF SOUTH CAROLINA:**

ALAN M. WILSON
South Carolina Attorney General

*/s/ Jared Q. Libet*

JARED Q. LIBET, *pro hac vice forthcoming or pending*
Office of the South Carolina Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-3970
Fax: (803) 734-0513

*Attorney for Plaintiff the State of South Carolina*

- 66 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR PLAINTIFF UTAH DIVISION OF CONSUMER PROTECTION:**

DEREK BROWN
Utah Attorney General

*/s/ Stevenson Smith*
_____
STEVENSON SMITH, *pro hac vice forthcoming or pending*
CARINA WELLS, *pro hac vice forthcoming or pending*
Utah Attorney General's Office
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84114
Tel: (801) 336-0310
Fax: (801) 530-6601

*Attorneys for Plaintiff Utah Division of Consumer Protection*

- 67 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR PLAINTIFF STATE OF WISCONSIN:**

JOSHUA L. KAUL
Wisconsin Attorney General

*/s/ Laura E. McFarlane*
LAURA E. MCFARLANE, *pro hac vice*
*forthcoming or pending*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707
Tel: (608) 266-8911
Fax: (608) 266-2250

*Attorney for Plaintiff State of Wisconsin*

**ATTESTATION**

I, Aaron M. Schue, am the ECF user whose user ID and password authorized the filing of this document.  Under Civil Local Rule 5-1(i)(3), I attest that all signatories to this document have concurred in this filing.

Dated: February 26, 2026                    /s/ Aaron M. Schue_____
                                                            Aaron M. Schue